UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ALEX EDWARD DIAKOGIANNIS,

                       Plaintiff,

           v.

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

_____

<u>DECISION & ORDER</u>

12-CV-6192P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Alex Edward Diakogiannis ("Diakogiannis") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income ("SSI"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 8).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 10, 11). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with the applicable legal standards.

_____

[1] After the commencement of this action, on February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security.

Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Diakogiannis's motion for judgment on the pleadings is denied.

## BACKGROUND

A. **Procedural Background**

Diakogiannis applied for benefits on June 24, 2009,[2] alleging he had been disabled since April 22, 2008, due to a learning disability, rotator cuff injury and a collar bone injury. (Tr. 20, 155-56).[3] On October 9, 2009, the Social Security Administration denied Diakogiannis's claim for disability benefits, finding that he was not disabled. (Tr. 71). Diakogiannis requested and was granted a hearing before Administrative Law Judge Milagros Farnes (the "ALJ"). (Tr. 30, 79-80). The ALJ conducted a video conference hearing on April 14, 2011. (Tr. 47, 49). Diakogiannis was represented at the hearing by his attorney, Keven Canali, Esq. (Tr. 47, 231). In a decision dated April 29, 2011, the ALJ found that Diakogiannis was not disabled and thus was not entitled to benefits. (Tr. 20-30). On February 15, 2012, the Appeals Council's denied Diakogiannis's request for review of the ALJ's decision. (Tr. 1-3). Diakogiannis commenced this action seeking review of the Commissioner's decision on April 13, 2012. (Docket # 1).

---

[2] Plaintiff previously had applied for and been denied disability benefits on November 10, 2008. (Tr. 140).

[3] The administrative transcript shall be referred to as "Tr. ___."

**B. Non-Medical Evidence**

           Diakogiannis was born on November 20, 1979 and is now 33 years old. (Tr. 136). He graduated from Webster High School, where he was placed in a special education setting and provided an individualized education plan ("IEP"). (Tr. 52, 205, 211). During high school, Diakogiannis's grades generally ranged between 70-85. (Tr. 196, 199-204). After high school, Diakogiannis attended two years of BOCES programming at the University of Rochester. (Tr. 52, 205, 211). The program was designed to assist Diakogiannis in developing skills and strategies to work independently. (Tr. 207, 211). Diakogiannis spent mornings in class and was bused to his job as a food service aide in the afternoons. (Tr. 211). While attending the program, Diakogiannis lived with his mother. (*Id.*). Records from the program indicate that Diakogiannis had been diagnosed with Attention Deficit Disorder and had cognitive skills in the "low average to borderline range of functioning." (*Id.*). Diakogiannis had a verbal IQ of 81, performance IQ of 84 and a full scale IQ of 80. (Tr. 212). The records indicated that Diakogiannis could work independently with clear directions. (Tr. 211).

           Diakogiannis's previous work history includes employment as a groundskeeper, machine operator, fast food preparer, warehouse worker, and inventory control employee at a grocery store. (Tr. 157). With the exception of the machine operator position, Diakogiannis was employed in each position for no more than one year. (*Id.*). He has not been employed since approximately September 15, 2008. (Tr. 156). His most recent job involved inventory control at a grocery store. (Tr. 53). According to Diakogiannis, he stopped working because of pain in his shoulder. (*Id.*). The position required Diakogiannis to move and lift products from the shelves in order to determine the number of products on the shelf. (*Id.*). According to Diakogiannis, the

position required him to walk or stand approximately four to eight hours a day, but did not require him to lift more than ten pounds. (Tr. 177).

At the time that Diakogiannis applied for disability benefits, he lived with his girlfriend and helped her take care of her children. (Tr. 163-64). Diakogiannis reported that his daily activities included performing his personal hygiene, preparing food, socializing with friends and family, shopping, cleaning the house and playing video games. (Tr. 164). According to Diakogiannis, he helps care for the children by feeding them, bathing them, cleaning up after them and taking them to the park. (*Id.*). His girlfriend does the majority of the household chores, including cooking, cleaning and laundry, although Diakogiannis assists her by taking out the garbage and helping with the laundry, dishes and preparing meals. (Tr. 164-67).

In connection with his application for benefits, Diakogiannis reported that his shoulder injury had rendered him unable to work because he could not perform heavy lifting or tasks requiring range of motion, he had trouble sleeping and could no longer lift weights. (Tr. 164, 167). According to Diakogiannis, he could drive, ride a bicycle, shop, prepare simple meals and play pool. (Tr. 165-67, 173). Diakogiannis reported that he could not lift more than fifteen pounds and could not reach above his shoulders. (Tr. 168). He also reported difficulty with focus, short-term memory and reading, but stated that he could pay bills, count change, handle a savings account and use a checkbook. (Tr. 167, 169).

On September 30, 2009, the disability analyst, S. Woodmansee ("Woodmansee"), completed a physical residual functional capacity ("RFC") assessment. (Tr. 289-94). Woodmansee opined that Diakogiannis could occasionally lift twenty pounds and frequently lift ten pounds. According to Woodmansee, Diakogiannis could stand or sit for six hours during an

eight-hour work day and was limited in his ability to push or pull.  (Tr. 290).  In addition,

Woodmansee opined that Diakogiannis could occasionally climb ladders, ropes or scaffolds and

could frequently balance, stoop, kneel, crouch and crawl.  Finally, Woodmansee noted that

Diakogiannis was limited in his ability to reach in all directions.  (Tr. 291).  Based upon this

assessment of Diakogiannis's exertional limitations, Woodmansee opined that Diakogiannis

retained the ability "to perform work activities at a light exertional level which can be performed

with one arm/hand."  (Tr. 293).


**C.  Medical Evidence**

Diakogiannis injured his left shoulder in the latter part of 2007 while he was

living in New York.  (Tr. 242, 244).  Diakogiannis subsequently moved to Pennsylvania and, on

April 29, 2008, began treatment with Dr. Kirsten Johnsen ("Dr. Johnsen") at Southeast Health

Services.  (Tr. 233, 244).  During the initial appointment, he complained of left shoulder pain.

(Tr. 244).  Dr. Johnsen examined him and noted tenderness to palpitation around the posterior

shoulder girdle.  (*Id.*).  Dr. Johnsen also noted that his pain was greater with internal rotation than

external rotation and that his strength was decreased, although his bicep strength and finger grip

was normal.  (*Id.*).  Dr. Johnsen recommended a magnetic resonance imaging ("MRI"), physical

therapy, anti-inflammatory drugs and, if necessary, an injection.  (*Id.*).  Dr. Johnsen also

completed paperwork for temporary disability.  (*Id.*).

On June 11, 2008, Diakogiannis returned to Dr. Johnsen complaining of increased

pain.  (Tr. 242).  Dr. Johnsen prescribed an injection of Lidocaine and ordered an MRI.

(Tr. 242-43).  An MRI was conducted on July 5, 2008 and revealed a partial tear or tendinosis of

the supraspinatus tendon. (Tr. 247). Diakogiannis was referred to an orthopaedic surgeon. (Tr. 241). Diakogiannis saw Dr. Johnsen on July 23, 2008 and again on August 19, 2008 to obtain preoperative clearance. (Tr. 238-40). Dr. Johnsen's treatment notes indicate that Diakogiannis was scheduled for surgery to repair his rotator cuff on August 21, 2008. (Tr. 238).

On September 12, 2008, Diakogiannis began post-surgery physical therapy at Lancaster General Hospital.[4] (Tr. 262). Between September 12, 2008 and October 29, 2008, Diakogiannis attended nine therapy sessions. (Tr. 255-62). The physical therapist reported improvement in pain, range of motion and improved functional status. (Tr. 255). Diakogiannis did not return for subsequent physical therapy appointments and, when contacted, reported that he had returned to work, could no longer attend his scheduled appointments, but would contact the therapist to reschedule. (Tr. 252). Diakogiannis was ultimately discharged from care on December 2, 2008, when he failed to recontact the therapist. (*Id.*).

Diakogiannis relocated to Rochester, New York and, on May 28, 2009, began treatment with an internal physician, Dr. Periasamy Samikkannu ("Dr. Samikkannu"). (Tr. 230, 354). During that visit, Diakogiannis complained of left shoulder pain. Dr. Samikkannu noted that his range of motion in his left arm was 120 degrees with pain and that there was mild tenderness with palpation at the supraspinatus area. (*Id.*). Dr. Samikkannu assessed adhesive capsulitis of the shoulder, prescribed Vicodin for pain and referred Diakogiannis to Dr. Todd Stein ("Dr. Stein"), an orthopaedic specialist. (*Id.*). There are no records to suggest that Diakogiannis began treatment with Dr. Stein at that time.

---

[4] Diakogiannis previously had started physical therapy in July 2008, but was discharged due to his pending surgery. (Tr. 265, 268).

On September 3, 2009, state examiner Dr. Adele Jones ("Dr. Jones") conducted a consultative psychiatric evaluation of Diakogiannis. (Tr. 279). During the evaluation, Diakogiannis reported that he had a history of suicide attempts and of auditory command hallucinations. (Tr. 280). He also reported that he was able to perform personal hygiene without assistance, could prepare meals including eggs, burgers and hot dogs. (Tr. 281). In addition, he reported that he could perform household chores and shop, but stated that he often would overfill the laundry machine or forget to purchase items. (*Id.*). He also reported that he did not manage his own money, but could drive, although he had an out-of-state license. (*Id.*). He reported that he is limited to lifting fifteen pounds. (*Id.*).

Upon examination, Dr. Jones opined that Diakogiannis had normal speech, coherent, linear and somewhat concrete thought processes, full range affect, neutral mood, clear sensorium, intact attention, concentration and memory, and low average cognitive functioning with a somewhat limited general fund of information. (Tr. 280-81). Dr. Jones noted that Diakogiannis was able to conduct simple addition, but could not perform simple multiplication. (Tr. 281). Dr. Jones assessed that Diakogiannis's insight was fair and his judgment was adequate. (*Id.*). According to Dr. Jones, Diakogiannis could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration and a regular schedule, make appropriate decisions, relate adequately with others and appropriately deal with stress. (Tr. 282). Dr. Jones opined that Diakogiannis was able to learn new tasks, but required multiple repeated instructions. (*Id.*). In addition, Dr. Jones noted that due to cognitive deficits, Diakogiannis might need supervision for complex tasks. (*Id.*).

According to Dr. Jones, Diakogiannis's prognosis with vocational training was good, but he would need assistance to manage financial matters. (*Id.*).

On September 3, 2009, state examiner Dr. Karl Eurenius ("Dr. Eurenius") conducted a consultative internal medicine examination. (Tr. 274). Diakogiannis reported left shoulder pain and Attention Deficit Hyperactivity Disorder ("ADHD"). (*Id.*). According to Diakogiannis, his surgery had alleviated some pain, but his shoulder continued to "pop in and out," and he felt a grinding activity during shoulder movement. (*Id.*). As a result, Diakogiannis contended that he could not sleep on his left side and could not elevate his arm. (*Id.*). Diakogiannis reported that he could perform his own personal hygiene and go shopping, but that his girlfriend performed the household chores. (Tr. 275). Dr. Eurenius noted that Diakogiannis had a normal gait, used no assistive devices, could fully squat and did not need any assistance changing for the exam or getting on or off of the exam table. (*Id.*).

Dr. Eurenius reported Diakogiannis was unable to elevate his left arm above 90 degrees and noted pain at the top of the shoulder when Diakogiannis attempted to internally and externally rotate the left shoulder. (Tr. 276). According to Dr. Eurenius, Diakogiannis had full strength in his upper extremities, except that his left grip was 4/5 and his left arm elevation was 4/5. Dr. Eurenius reported that Diakogiannis's hand and finger dexterity was intact. Dr. Eurenius opined that Diakogiannis was "moderately limited in reaching and handling objects with his dominant left arm" and was "limited in lifting or carrying more than 5 pounds in that arm." (Tr. 277).

On October 6, 2009, agency medical consultant Dr. R. Altmansberger ("Dr. Altmansberger") completed a Psychiatric Review Technique. (Tr. 295-308). Dr. Altmansberger

concluded that Diakogiannis's mental impairments were not severe and did not meet or equal a listed impairment. (Tr. 295). Dr. Altmansberger did not complete a mental residual functional capacity assessment. (Tr. 305). According to Dr. Altmansberger, Diakogiannis had no history of psychiatric treatment or symptoms and the evidence "indicate[d] no more than mild limitations." (Tr. 307).

Beginning in September 2009, Diakogiannis resumed treatment with Dr. Samikkannu. (Tr. 384). The September 10, 2009 treatment notes indicate that Diakogiannis had not been seen since May 2009. (*Id.*). Diakogiannis told Dr. Samikkannu that he was in the process of applying for SSI and that he wanted to have an MRI, but wished to follow-up with different doctors. (*Id.*). Dr. Samikkannu did not perform an examination, but ordered an MRI. (*Id.*). Diakogiannis returned on September 29, 2009, complaining of left shoulder pain and requested that Dr. Samikkannu complete paperwork. (Tr. 385). Dr. Samikkannu conducted an examination and noted that Diakogiannis's range of motion in his shoulders was limited to 130 degrees. (*Id.*). Dr. Samikkannu's notes indicate that she completed a form in connection with Diakogiannis's application for disability benefits. (*Id.*). Diakogiannis returned again on December 18, 2009, requesting that Dr. Samikkannu complete paperwork indicating that he was unable to work. (Tr. 388). According to the treatment notes, Diakogiannis needed the paperwork in connection with a family court proceeding. (*Id.*). The notes further reflect that Dr. Samikkannu provided the statement to Diakogiannis, but did not conduct an examination. (*Id.*).

On February 17, 2010, Diakogiannis returned to Dr. Samikkannu complaining that his shoulder had "popped out of socket." (Tr. 389). According to Diakogiannis, he "popped it back in place by hitting it against the wall." (*Id.*). Dr. Samikkannu noted that Diakogiannis's

range of motion in his left arm was limited to 90 degrees. (*Id.*). She prescribed Naprosyn and moist heat. (*Id.*). During follow-up visits on March 10 and April 7, 2010, Dr. Samikkannu noted that Diakogiannis had limited range of motion in all directions in his left arm. (Tr. 390, 392). She prescribed Meloxicam, Naprosyn and Norco and referred Diakogiannis to Dr. Stein, an orthopaedic specialist. (*Id.*).

The medical records reflect that Diakogiannis was seen by Dr. Stein on two occasions. (Tr. 380-83). On April 21, 2010, Diakogiannis had an initial exam by Dr. Stein. (Tr. 380). Upon examination, Dr. Stein noted that there was no obvious atrophy of the left shoulder. (Tr. 381). In addition, Dr. Stein noted that his flexion was 150 and that Diakogiannis had 10 degree loss of external rotation on his left side as compared to his right side. (*Id.*). According to Dr. Stein, external rotation on his left arm was 50 degrees and internally he could rotate to his midlumbar spine. (*Id.*). Dr. Stein opined that Diakogiannis's rotator cuff strength in rotation and abduction was excellent and that Diakogiannis had "[w]ell-healed surgical arthroscopic portals." (*Id.*). Dr. Stein's review of Diakogiannis's shoulder x-rays were normal and Dr. Stein ordered an MRI. (*Id.*). Dr. Stein examined Diakogiannis again on May 5, 2010. (Tr. 382). After reviewing the MRI, Dr. Stein noted that there was no evidence of labral anchors, the labrum appeared intact, the rotator cuff was normal and there was no evidence of arthritis. (*Id.*). Diakogiannis's range of motion was unchanged. (*Id.*). Diakogiannis complained of pain and requested pain medication. (*Id.*). Dr. Stein did not prescribe narcotics, but instead prescribed Relafen and recommended physical therapy. (*Id.*).

Diakogiannis began physical therapy with therapist John Ahern ("Ahern") at Sports Physical Therapy on May 12, 2010. (Tr. 357). During the initial session, Ahern noted

that Diakogiannis demonstrated impairments including decreased range of motion, flexibility, strength, scapulohumeral rhythm, activities of daily living and impaired posture. (Tr. 359). Diakogiannis reported difficulty with all motions above the shoulder level. (*Id.*). Specifically, Diakogiannis reported difficulty washing and combing his hair, carrying groceries, and lifting and carrying his son. (*Id.*). During May and June 2010, Diakogiannis attended five additional physical therapy sessions. (Tr. 361-79). During his last visit, on June 21, 2010, Diakogiannis reported that he was 80% improved, was able to lift his children and was able to perform all of his daily activities without pain or compensation. (Tr. 376). Diakogiannis felt that he could complete his remaining strength training at home using the home exercise program provided by Ahern. (*Id.*). Notes from that session indicate that Diakogiannis's active range of motion in his left arm had improved to 170 degrees flexion and abduction, his internal rotation had improved to 80 degrees and his external rotation had improved to 85 degrees. (Tr. 377). The notes also indicate that Diakogiannis had partially achieved all of his long-term physical therapy goals, including increasing his left arm range of motion by 30 degrees to allow him to perform his activities of daily living without restriction. (Tr. 378-79). Accordingly, Diakogiannis was discharged from physical therapy with instructions to continue his home exercise program. (Tr. 378).

Approximately one month later, on July 27, 2010, Diakogiannis returned to Dr. Samikkannu complaining of left shoulder pain and requesting that the doctor complete a form. (Tr. 395). Dr. Samikkannu noted that the range of motion in his left arm was reduced to 120 degrees. (*Id.*). Dr. Samikkannu completed the paperwork and advised Diakogiannis to follow-up with Dr. Stein. (*Id.*).

**D. Proceedings Before the ALJ**

At the administrative hearing, Diakogiannis testified that he was a high school graduate who was currently living with his mother. (Tr. 52). During high school, Diakogiannis attended special education classes. (*Id.*). According to Diakogiannis, he last worked when he was living in Pennsylvania in 2009. (Tr. 53). His last employment involved taking inventory at a grocery store. (*Id.*) Diakogiannis testified that he can no longer perform that work because of his left shoulder injury. (Tr. 53-54). In addition, Diakogiannis was told by coworkers that his pace was too slow. (Tr. 54).

Diakogiannis testified that he was currently taking Naprosyn without side effects. (Tr. 55, 64). According to Diakogiannis, he can lift ten pounds on a regular basis and sometimes has difficulty lifting and stretching. (Tr. 56). In addition, Diakogiannis testified that he sometimes experiences a tingling feeling in his left arm through his fingers. (*Id.*). According to Diakogiannis, he is left-hand dominant. (Tr. 57). Diakogiannis testified that he has difficulty focusing and remaining on task, but does not take any medications for those issues. (*Id.*). He also testified that he suffers from asthma. (Tr. 57-58).

With respect to his daily activities, Diakogiannis testified that he takes his fiancee to work every morning and picks her up in the afternoon. (Tr. 58). He also watches television. (*Id.*). He has difficulty sleeping because he cannot sleep on his left side, and he sometimes bumps his shoulder while sleeping, which causes pain. (*Id.*). His mother prepares the meals, but Diakogiannis can prepare simple meals if necessary. (Tr. 59). Diakogiannis testified that he can wash dishes, but that doing so sometimes causes shooting pain up and down his arm. (*Id.*). He empties the garbage cans, but cannot vacuum, sweep or mop because the stretching may cause

his rotator cuff to pop out of place. (Tr. 59-60). According to Diakogiannis, his mother takes care of his finances. (Tr. 61). Diakogiannis testified that he has difficulty reading, does not read the newspaper and has a fourth-grade reading level. (Tr. 61-62). He does not socialize, but is able to go to restaurants and has no problem ordering food. (*Id.*). In addition, Diakogiannis testified that he has difficulties dressing himself when required to lift his arm above his head or when putting on his shoes, socks and pants. (Tr. 62-63). He is able to button his clothes and pick up small coins from a table, but due to numbness in his fingers, those activities may take more time or require him to use his right hand. (Tr. 64-65). According to Diakogiannis, he has difficulty washing his hair because it requires him to reach his arm over his head. (Tr. 63).

A vocational expert, Donald Woolwine ("Woolwine"), also testified during the hearing. (Tr. 65). The ALJ first asked Woolwine whether a person of the same age as Diakogiannis, with the same education and vocational profile, who was limited to a light residual functional capacity, with no reaching overhead with his dominant arm and who was limited to simple, routine, repetitive tasks with no production rate or pace work, would be able to perform any of the work that Diakogiannis previously performed. (Tr. 65-66). Woolwine opined that such a person would not be able to work in any of Diakogiannis's former employment positions. (*Id.*). According to Woolwine, however, such a person could perform other regional and national jobs. (Tr. 66). These jobs include: (1) hand packer; (2) products weigher; (3) package machine tender; (4) product sorter; (5) sedentary surveillance monitor; and, (6) production machine tenders. (Tr. 66-67).

**E. <u>Additional Evidence Submitted to the Appeals Council</u>**

Diakogiannis submitted additional medical records in connection with his request for review of the ALJ's decision. (Tr. 5). The Appeals Council incorporated the additional records as evidence in this case. (*Id.*). These records indicate that Dr. Stein referred Diakogiannis to a neurologist, Dr. James C. Azurin ("Dr. Azurin"), after he complained of neck pain and left arm numbness, tingling and pain. (Tr. 406). On August 3, 2011, Diakogiannis underwent an MRI of his brain and spine. (Tr. 403-04). Dr. Azurin noted that the MRI of the brain "did not reveal any significant abnormalities." (Tr. 406). With respect to the spine MRI, there was a disk extrusion at the right C5-C6 level, but "no evidence of neuroforaminal stenosis" to account for Diakogiannis's upper extremity paresthesias. (*Id.*). Dr. Azurin's examination of Diakogiannis revealed no distress, and Dr. Azurin concluded that there was no neurological cause for his symptoms. (*Id.*).

Finally, Diakogiannis visited Urgent Care Now on September 20, 2011 with complaints of lower back pain. (Tr. 397). According to the records, Diakogiannis reported that he was injured while playing football the previous weekend. (*Id.*). An x-ray revealed a normal lumbar spine. (Tr. 401).

**<u>DISCUSSION</u>**

**A. <u>Standard of Review</u>**

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled, . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted). Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the Court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weights." *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the Court, had it heard the evidence *de novo*, might have found otherwise." *Matejka v.*

*Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five-steps are:

> (1) whether the claimant is currently engaged in substantial gainful activity;
>
> (2) if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";
>
> (3) if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;
>
> (4) if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and
>
> (5) if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467. "The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

### 1. **The ALJ's Decision**

In her decision, the ALJ followed the required five-step analysis for evaluating disability claims. (Tr. 20-30). Under step one of the process, the ALJ found that Diakogiannis did not engage in substantial gainful activity since June 24, 2009, the application date. (Tr. 22). At step two, the ALJ concluded that Diakogiannis has the severe impairments of adhesive capsulitis of the shoulder, anterior labral tear, rotator cuff tendinitis, and attention deficit hyperactivity disorder, but that Diakogiannis's other impairments – including gastroesophageal reflux disease, possible asthma/chronic obstructive pulmonary disease, borderline heart size with likely atherosclerotic aorta, adjustment disorder with mixed disturbance of emotions and conduct, alcohol dependence in remission and learning disorder – were nonsevere. (*Id.*). At step three, the ALJ determined that Diakogiannis does not have an impairment (or combination of impairments) that meets or medically equals one of the listed impairments. (Tr. 22-23). At step four, the ALJ concluded that Diakogiannis had the residual functional capacity to perform light work with certain restrictions. (Tr. 24). Specifically, the ALJ determined that Diakogiannis's capacity was limited to simple, routine, and repetitive tasks and that he could not perform production rate or pace work or perform overhead reaching with his left arm. (*Id.*). Finally, the ALJ determined that Diakogiannis had no relevant past work, but that considering his age, education, work experience, and RFC, there were jobs that existed in significant number in the national economy that Diakogiannis could perform. (Tr. 29). Accordingly, the ALJ found that Diakogiannis is not disabled.

### 2. **Diakogiannis's Contentions**

Diakogiannis contends that the ALJ's determination that he is not disabled is not supported by substantial evidence and that the ALJ applied the wrong legal standard in assessing Diakogiannis's credibility. (Docket # 10-1). First, Diakogiannis maintains that the ALJ erred when she found his learning disability to be nonsevere at step two. (*Id.* at 12-14). According to Diakogiannis, this error was not harmless because it permeated the RFC determination. (*Id.*). Second, Diakogiannis contends that the ALJ's RFC assessment was not supported by substantial evidence. (*Id.* at 14-18). According to Diakogiannis, when conducting the RFC assessment, the ALJ impermissibly failed to conduct a function-by-function analysis both of Diakogiannis's mental and physical limitations. (*Id.* at 15-16). This error was not harmless, according to Diakogiannis, because it caused the ALJ to overlook Diakogiannis's reaching limitations, as well as his cognitive limitations. (*Id.*). In addition, Diakogiannis contends that the ALJ failed to adequately develop the record because she did not recontact Dr. Samikkannu to request her opinion of Diakogiannis's exertional limitations. (*Id.* at 16-18). Next, Diakogiannis argues that the ALJ did not apply the appropriate legal standards when assessing his credibility. (*Id.* at 19). In addition, Diakogiannis contends that the ALJ misstated his testimony. (*Id.* at 21). Finally, Diakogiannis contends that the testimony of the vocational expert cannot provide substantial evidence at step five because it was based upon an RFC which did not fully account for Diakogiannis's limitations. (*Id.* at 22-23).

In his reply papers, Diakogiannis continues to assert that the ALJ erred by determining that his learning disorder was not severe. (Docket # 15 at 1-2). In addition, Diakogiannis contends that this error was compounded by the ALJ's failure to conduct a

function-by-function analysis in connection with the RFC assessment of his mental limitations. (*Id.* at 2-3). In addition, Diakogiannis asserts that the assessments from Dr. Jones and Dr. Altmansberger cannot provide substantial evidence to support the ALJ's mental RFC assessment because they are internally inconsistent and are not based upon all of the available records. (*Id.* at 4-5).

As discussed further below, the Court finds that the ALJ's determination was supported by substantial evidence and was not the product of legal error. Furthermore, the Court finds that the ALJ did not err in her assessment of Diakogiannis's subjective complaints.

## B. <u>Analysis</u>

### 1. <u>Severity Assessment</u>

As stated above, at step two of the evaluation, the ALJ must determine whether the claimant has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. 404.1520 (a)(4)(ii), (c). "An impairment or combination of impairments is 'not severe' when medical and other evidence establishes only a slight abnormality or a combination of slight abnormalities that would have at most a minimal effect on an individual's ability to perform basic work activities." *Jeffords v. Astrue*, 2012 WL 3860800, *3 (W.D.N.Y. 2012) (quoting *Ahern v. Astrue*, 2011 WL 1113534, *8 (E.D.N.Y. 2011)); *see also Schifano v. Astrue*, 2013 WL 2898058, *3 (W.D.N.Y. 2013) ("[a]n impairment is severe if it causes more than a *de minimus* limitation to a claimant's physical or mental ability to do basic work activities").

Even assuming that Diakogiannis's learning disorder constituted a severe impairment, I find that any error in failing to find the impairment severe was harmless. As a general matter, an error in an "ALJ's severity assessment with regard to a given impairment is harmless . . . 'when it is clear that the ALJ considered the claimant's [impairments] and their effect on his or her ability to work during the balance of the sequential evaluation process.'" *Graves v. Astrue*, 2012 WL 4754740, *9 (W.D.N.Y. 2012) (alteration in original) (quoting *Zenzel v. Astrue*, 2012 WL 3929895 (N.D.N.Y.), *report and recommendation adopted*, 2012 WL 3929892 (N.D.N.Y. 2012)). The ALJ considered Diakogiannis's learning disability at length in her analysis. First, the ALJ specifically considered Diakogiannis's learning disability at step three. (Tr. 24 ("these requirements are not met because the claimant is not dependent on others for his personal needs because of his learning disability")). Further, the ALJ continued to consider Diakogiannis's learning disorder in connection with her RFC analysis. In doing so, the ALJ noted that his school records indicated "that he attended special educations classes . . . [and] had verbal IQ scores of seventy-eight, performance IQ scores of eighty-two, and a full-scale IQ score of seventy-eight." (Tr. 27). In addition, the ALJ recognized that a post-high school psychologist found that Diakogiannis "suffered from low average cognitive skills and significantly delayed adaptive behavior skills." (*Id.*). The ALJ accounted for this impairment in finding that Diakogiannis could perform "simple, routine and repetitive tasks" and concluding that he had moderate limitations maintaining concentration, persistence or pace. (Tr. 23-24). Accordingly, "any error in step two's severity determination was harmless." *Graves v. Astrue*, 2012 WL 4754740 at *9 (nonsevere finding at step two harmless where the ALJ "considered [claimant's] learning disability and its effect on her ability to work during the balance of the

20

sequential evaluation process"); *see also Schifano v. Astrue*, 2013 WL 2898058 at *3 ("[w]here a finding of a severe impairment is improperly omitted, the error may be deemed harmless where the disability analysis continues and the ALJ considers the omitted impairment in the RFC determination") (citing *Reices-Colon v. Astrue*, 2013 WL 1831669, *1 (2d Cir. 2013) (summary order)).

Diakogiannis contends that the failure to find his learning disability severe was not harmless error because the ALJ's "restriction to 'simple, routine and repetitive tasks' does not accurately and completely describe [Diakogiannis's limitations]." (Docket # 10-1 at 13). That contention challenges the ALJ's RFC assessment and is addressed below.

## 2. **RFC Assessment**

An individual's RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)). When making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)). "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 380 F. App'x 231 (2d Cir. 2010).

Diakogiannis challenges the ALJ's RFC determination on the grounds that it failed to account for all of his physical and mental limitations.  With respect to his physical limitations, Diakogiannis contends that the ALJ's failure to conduct a function-by-function assessment ignored Diakogiannis's inability to reach in all directions, not just reaching above his head.  (Docket # 10-1 at 16).  In addition, according to Diakogiannis, the ALJ failed to account for his difficulties handling objects and fingering.  (*Id.*).  Further, Diakogiannis contends that remand is required because the ALJ erred by failing to recontact his primary care physician, Dr. Samikkannu, to obtain a medical assessment of his physical limitations.  With respect to his mental limitations, Diakogiannis contends that the ALJ's failure to conduct a function-by-function analysis of Diakogiannis's mental capabilities was error, but does not specifically identify any specific limitation that the ALJ failed to address.  These contentions are addressed below.

### (a)  Function-by-Function Assessments

Diakogiannis argues that the ALJ failed to conduct a function-by-function assessment of his physical and mental capabilities as required by Social Security Ruling 96-8p.  That ruling provides that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . .  Only after that may RFC be expressed in terms of the exertional levels of work."  SSR 96-8p, 1996 WL 374184 at *5.  Such work-related functions include "physical abilities such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions; mental abilities such as understanding, remembering, carrying out instructions, and responding appropriately to supervisions; and other abilities that may be affected by impairments, such as

seeing hearing, and the ability to tolerate environmental factors." *Cichocki v. Astrue*, 2013 WL 4749644, *3 (2d Cir. 2013) (*per curiam*) (citing 20 C.F.R. §§ 404.1545, 416.945; SSR 96-8p, 1996 WL 374184 at *5-6). The function-by-function assessment is meant to ensure that the ALJ does not overlook an individual's particular limitations or restrictions which "could lead to an incorrect use of an exertional category." *See id.* (citing SSR 96-8p, 1996 WL 374184 at *4).

An ALJ's failure to express a claimant's RFC in a function-by-function analysis does not necessarily mandate remand so long as the RFC is otherwise supported by substantial evidence. *See id.* at *4 ("[w]e decline to adopt a *per se* rule[;] . . . [w]here an ALJ's analysis at Step Four regarding a claimant's functional limitations and restrictions affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous, we agree with our sister Circuits that remand is not necessary merely because an explicit function-by-function analysis was not performed"); *Campbell v. Astrue*, 465 F. App'x 4, 6 (2d Cir. 2012) (summary order) ("while the ALJ did not expressly discuss [claimant's] ability to perform each of the functions . . . [,] substantial evidence supports the ALJ's overall RFC determination"); *Koch v. Colvin*, 2013 WL 3244789, *5 (W.D.N.Y. 2013) ("district courts in this Circuit are divided whether [a function-by-function] analysis is required . . . [,] [b]ut the Second Circuit recently held that such an analysis is unnecessary"); *Murphy v. Astrue*, 2013 WL 1452054, *6 (W.D.N.Y. 2013) (substantial evidence supported RFC assessment and remand was not required, "although the ALJ did not methodically walk through each 'function'"); *Lloyd v. Astrue*, 2013 WL 690499, *4 (W.D.N.Y. 2013) ("[t]here is no dispute that the ALJ did not conduct an explicit function-by-function assessment in his decision[,] [b]ut that is not, *ipso facto*, cause for

23

remand"). Although remand is not automatic, it would be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Cichocki v. Astrue*, 2013 WL 4749644 at *4.

The ALJ did not conduct a function-by-function analysis of Diakogiannis's physical or mental capabilities, but she discussed in considerable detail the medical records and the testimony as they pertained to both his physical and mental capabilities. The ALJ recounted Diakogiannis's subjective complaints of his limitations, as well as the comprehensive medical records relating to Diakogiannis's impairments – including his education records; a consultative psychiatric examination conducted by Dr. Jones; a consultative psychiatric assessment completed by Dr. Altmansberger; an internal medicine consultative examination conducted by Dr. Eurenius; treatment notes from Dr. Johnsen, who treated Diakogiannis prior to his surgery; post-surgery physical therapy notes; treatment notes from Dr. Samikkannu, his primary care physician; treatment notes from Dr. Stein, an orthopaedic specialist; and, treatment notes from Diakogiannis's most recent physical therapist. (Tr. 25, 27-28).

With respect to Diakogiannis's physical limitations, the ALJ discussed the results of the consultative examination conducted by Dr. Eurenius, who concluded that Diakogiannis was moderately limited in reaching and handling with his left arm and that he was unable to elevate his arm above ninety degrees. In addition, the ALJ described treatment notes indicating that Diakogiannis's range of motion varied greatly depending upon the day. Finally, the ALJ recounted Diakogiannis's physical therapy treatment records that indicated that at the time of discharge, "he was able to lift his kids without pain or instability . . . [and] able to do his

24

exercises at home pain free."  In addition, the ALJ summarized Diakogiannis's hearing testimony which described various limitations in his ability to perform household chores, but which indicated that he could fasten his buttons, pick up small coins, empty the garbage, play pool and frequently lift ten pounds.  (Tr. 26).  The ALJ contrasted that testimony with Diakogiannis's statements on his disability report suggesting that he was able to clean the house, shop when necessary, care for his girlfriend's children and lift fifteen pounds.

Diakogiannis argues that the ALJ's failure to conduct a function-by-function analysis was not harmless because the ALJ overlooked his inability to reach in all directions and his difficulty fingering or handling objects.[5]  I disagree that the ALJ overlooked these limitations. The ALJ specifically discussed Diakogiannis's claims that "stretching or reaching his arm sometimes causes trouble" and that he reported "numbness" and "tingling and shooting pain down his fingers."  (Tr. 25).  The ALJ discounted Diakogiannis's subjective complaints, noting that Diakogiannis testified that he "is able to pick up small coins and fasten buttons," that he was not currently seeking treatment for his shoulder injury, that he took no medication for the injury other than an anti-inflammatory drug, that he successfully completed physical therapy and reported that he was able "lift his kids without pain or instability," and that he continues to perform a number of activities of daily living.  After reviewing the evidence, the ALJ concluded that Diakogiannis could perform work at a light exertional level with the specific limitation that

---

[5]  At oral argument, counsel for Diakogiannis cited *Selian v. Astrue*, 708 F.3d 409 (2d Cir. 2013), in support of the argument that failure to evaluate a claimant's reaching limitations could constitute error.  In *Selian*, the Second Circuit addressed whether it was error to rely on the Medical-Vocational Guidelines (the "Grids") when a claimant had reaching limitations.  *See Selian v. Astrue*, 708 F.3d at 421-22.  The Second Circuit held that when a claimant suffers from a non-negligible, non-exertional impairment, including reaching caused by a shoulder problem, reliance on the Grids is inappropriate and the testimony of a vocational expert is required.  In this case, the ALJ consulted a vocational expert and her hypothetical explicitly included a reaching limitation.  Accordingly, *Selian* is inapposite, in my estimation.

he could not reach overhead with his left hand. Although the ALJ did not conduct a function-by-function analysis, she considered and evaluated all relevant functions, and I conclude that her physical RFC assessment is supported by substantial evidence. *Cichocki*, 2013 WL 4749644 at *5 (ALJ's failure to perform a function-by-function analysis did not require remand where "the determination applied the proper legal standards and was supported by substantial evidence"); *Murphy v. Astrue*, 2013 WL 1452054 at *6 ("the ALJ adequately explained how the evidence supports her conclusions about the claimant's limitations and discussed the claimant's ability to perform sustained work activities") (quoting *Casino-Ortiz v. Astrue*, 2007 WL 2745704, *14 (S.D.N.Y. 2007), *report and recommendation adopted*, 2008 WL 461375 (S.D.N.Y. 2008)); *Lloyd v. Astrue*, 2013 WL 690499 at *4 ("aside from [plaintiff's] own complaints, the record contains no indication that [plaintiff] was significantly disabled in any of these areas[;] [a]ny error in failing to specifically address each [of] the functions was therefore harmless").

Similarly, the ALJ described in detail the record evidence pertaining to Diakogiannis's mental capabilities. As discussed above, the ALJ reviewed and noted the cognitive limitations discussed in Diakogiannis's educational records. In addition, the ALJ reviewed the consultative examination conducted by Dr. Jones, who opined that Diakogiannis had low normal IQ scores, but was able to understand and follow simple directions, perform simple tasks independently, maintain attention and concentration, maintain a schedule, make appropriate decisions, relate adequately with others and deal appropriately with stress, but would need repeated instructions and supervision when performing complex tasks. The ALJ also

considered Diakogiannis's testimony concerning his mental limitations, including his difficulty focusing, paying bills and reading.

Diakogiannis argues that the ALJ did not make any findings as to his ability to use judgment, respond to supervision and coworkers or deal with changes in the work setting. (Docket # 15 at 3). A review of the ALJ's decision belies this contention. After reviewing the record evidence, the ALJ concluded that Diakogiannis was able to perform simple, routine and repetitive tasks and that he could not perform production rate or pace work. These limitations are consistent with the ALJ's assessment that Diakogiannis had moderate difficulties with concentration, persistence or pace due to his ADHD, difficulties reading, short-term memory problems, and Diakogiannis's statement that he does not handle stress properly. (Tr. 23). They are also consistent with the ALJ's assessment that Diakogiannis suffered from, at most, mild restrictions in activities of daily living and social functioning based upon Diakogiannis's own reports that he is able to prepare simple meals, go shopping, assist in both household chores and childcare for his girlfriend's children, dine at restaurants, socialize with friends and family, and go to the library on a weekly basis. Accordingly, although the ALJ did not conduct a function-by-function assessment, I conclude that the ALJ discussed in depth Diakogiannis's mental capabilities and work-related functions and limitations and that her RFC assessment is supported by substantial evidence. *See Carrigan v. Astrue*, 2011 WL 4372651, *7-8 (D. Vt.) (failure to conduct function-by-function assessment of mental capabilities harmless where ALJ's decision discussed the claimant's work-related functions and limitations and where substantial evidence supported RFC assessment), *report and recommendation adopted*, 2011 WL 4372494 (D. Vt. 2011).

Diakogiannis contends that a restriction to "simple, routine and repetitive tasks" does not adequately capture all of his limitations. (Docket # 10-1 at 13). In support of this argument, Diakogiannis notes that he has difficulty with reading, multiplication and managing money. (*Id.*). Further, Diakogiannis argues that three of the jobs identified by the vocational expert – hand packer, production machine tender and sedentary systems monitor (which all have an SVP[6] of 2) – require an individual to perform multiplication or reading. (*Id.*). As an initial matter, I note that Diakogiannis does not specifically address the other jobs identified by the vocational expert – products weigher (SVP 1), package machine tender (SVP 2) or product sorter (SVP 2). Accordingly, even assuming three of the jobs identified by the vocational expert exceed Diakogiannis's mental capabilities, the vocational expert identified three additional jobs, which is more than sufficient to establish that there is work that Diakogiannis could perform. *See McQuaid v. Astrue*, 2012 WL 5472300, *5 (N.D.N.Y. 2012) (a "finding of one job is sufficient to demonstrate that there is other work that [plaintiff] could perform"); *Bull v. Comm'r of Soc. Sec.*, 2009 WL 799966, *6 (N.D.N.Y. 2009) ("[a]lthough the vocational expert identified only a single job, the Social Security Act affords benefits only to those who cannot engage in *any* other kind of substantial gainful work which exists in the national economy") (internal quotations omitted). In any event, although Diakogiannis reported reading difficulties, he also stated that he goes to the library once a week and is able to order at restaurants. In addition, although Dr. Jones and Diakogiannis indicated that he had difficulties managing his finances, Diakogiannis's own

---

[6] "'SVP' stands for 'specific vocational preparation,' and refers to the amount of time it takes an individual to learn to do a given job." *Urena-Perez v. Astrue*, 2009 WL 1726217, *20 n.43 (S.D.N.Y.), *report and recommendation adopted as modified*, 2009 WL 1726212 (S.D.N.Y. 2009). "Unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9." *Crews v. Astrue*, 2012 WL 1107685, *12 n.5 (S.D.N.Y.) (quoting SSR 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000)), *report and recommendation adopted*, 2012 WL 2122344 (S.D.N.Y. 2012).

statements on his disability application indicate that he is able to pay bills, count change, handle a savings account and use a check book. (Tr. 167). Accordingly, there is substantial evidence in the record to support the ALJ's mental RFC assessment.

Equally unavailing are Diakogiannis's arguments that Dr. Jones's evaluation should be rejected on the grounds that it is internally inconsistent and that both Dr. Jones's and Dr. Altmansberger's evaluations are flawed because they did not review Diakogiannis's education records. (Docket # 15 at 4-5). First, Diakogiannis's argument that Dr. Jones's evaluation is not entitled to weight is wholly at odds with Diakogiannis's own reliance upon Dr. Jones's findings. (Docket # 10-1 at 13). Second, there is nothing inconsistent in Dr. Jones's conclusion that Diakogiannis's limitations did "not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." (Tr. 282). The fact that Dr. Jones determined that Diakogiannis had some cognitive deficits simply does not require a conclusion that he was unable to perform his daily activities. Further, the mere fact that Dr. Jones and Dr. Altmansberger may not have reviewed Diakogiannis's school records does not invalidate their opinions. This is particularly true where, as here, Dr. Jones's evaluation is consistent with much of the information contained in the education records. For instance, Dr. Jones noted that Diakogiannis attended special education classes in high school, that he participated in a BOCES program after high school which involved "reviewing the high school education course work," and that he likely had low average intellectual functioning. (Tr. 279-81). Further, Dr. Altmansberger's assessment indicates that he reviewed Dr. Jones's evaluation in preparing his assessment. In any event, Diakogiannis does not identify any information in the education records that would have altered or impacted the two psychiatric evaluations.

### (b)  **Duty to Develop the Record**

Diakogiannis contends that the ALJ erred by failing to contact Dr. Samikkannu, his primary care physician, to seek her opinion as to Diakogiannis's ability to meet the physical demands of work.  "It is well established in the Second Circuit that an ALJ is under an obligation to develop the administrative record fully, to ensure that there are no inconsistencies in the record that require further inquiry, and to obtain the reports of treating physicians and elicit the appropriate testimony during the proceeding."  *Martello v. Astrue*, 2013 WL 1337311, *3 (W.D.N.Y. 2013).  The regulations provide that the administration "'*will* request a medical source statement' containing an opinion regarding the claimant's residual capacity."  *Tankisi v. Comm'r of Soc. Sec.*, 2013 WL 1296489, *4 (2d Cir. 2013) (summary order) (quoting 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6)).  The fact that a claimant is represented during the administrative hearing does not relieve the ALJ of her duty to develop the record.  *See id.* at * 4 n.1. ("counsel's responsibilities do not derogate from the ALJ's responsibility to investigate").

Although nothing in the record indicates that the ALJ attempted to obtain a functional assessment from Dr. Samikkannu, her failure to request such an assessment does not necessarily mandate remand.  *See id.* ("we hold that it would be inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity"); *see also Kunkel v. Comm'r of Soc. Sec.*, 2013 WL 4495008, *16 (W.D.N.Y. 2013) ("quite recently, a panel of the Second Circuit Court of Appeals rejected the idea that an ALJ's failure in his duty to request an RFC assessment from a treating physician necessarily or automatically requires a remand").  Instead, the relevant inquiry is whether, in the absence of the assessment, the record was sufficient to support the ALJ's RFC assessment.  *Id.* ("the issue is

whether the record was adequate to permit the ALJ to determine whether or not Plaintiff was disabled"). As discussed above, I conclude that the record was adequate to support the ALJ's RFC determination.

 As noted above, the record contained thorough treatment notes of several physicians who treated Diakogiannis for his shoulder injury, as well as a consultative examination by Dr. Eurenius specifically assessing Diakogiannis's exertional limitations. The absence of an assessment from Dr. Samikkannu is indeed puzzling considering (1) the multiple references in her treatment notes indicating that she completed paperwork at Diakogiannis's request; (2) the ALJ's suggestion that Diakogiannis was "insistent in trying to get a statement from his physician"; (3) the fact that Diakogiannis was represented by counsel at the hearing; and, (4) the fact that although his counsel submitted additional records to the Appeals Council, those records did not include an assessment from Dr. Samikkannu.[7] In any event, because the record was otherwise sufficient to support the ALJ's RFC assessment, the ALJ's failure to develop the record by attempting to obtain an assessment from Dr. Samikkannu does not require remand. *See Tankisi v. Comm'r of Soc. Sec.*, 2013 WL 1296489 at *4 ("[g]iven the specific facts of this case, including a voluminous medical record assembled by the claimant's counsel that was adequate to permit an informed finding by the ALJ, we hold that it would be inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity").

---

[7] The absence of an assessment in the records submitted in connection with Diakogiannis's request for review of the ALJ's decision is particularly curious considering Diakogiannis's argument to the Appeals Council was that the ALJ failed to give proper weight to Dr. Samikkannu's opinion (contained in her treatment notes) that Diakogiannis "was not able to work for more than one year." (Tr. 229-31).

### 3. **Credibility Assessment**

Diakogiannis also contends that the ALJ applied the wrong legal standard when assessing his credibility. The ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 27). According to Diakogiannis, this credibility finding was error because the ALJ found that Diakogiannis's statements were inconsistent with her own RFC determination. (Docket # 10-1 at 19). This argument has been rejected by a number of courts. *See Luther v. Colvin*, 2013 WL 3816540, *7-8 (W.D.N.Y. 2013) (ALJ properly assessed plaintiff's subjective complaints despite language in opinion that the alleged symptoms were "inconsistent with the above residual functional capacity"); *Briscoe v. Astrue*, 892 F. Supp. 2d 567, 585 (S.D.N.Y. 2012) ("[r]ead in context, however, this statement does not indicate that the RFC assessment was a basis for a finding of lack of credibility"). The ALJ specifically stated that she assessed Diakogiannis's statements concerning the intensity, persistence and limiting effects of his symptoms "[a]fter careful consideration of the evidence." (Tr. 27).

An ALJ's credibility assessment should contain a two-step analysis. *Robins v. Astrue*, 2011 WL 2446371, *4 (E.D.N.Y. 2011). First, the ALJ must determine whether the evidence reflects that the claimant has a medically determinable impairment or impairments that could produce the relevant symptom. *Id.* (citing 20 C.F.R. 404.1529). Next, the ALJ must evaluate "the intensity, persistence and limiting effects of the symptom, which requires a credibility assessment based on the entire case record." *Id.* (citing 20 C.R.F. § 404.1529(c)).

The relevant factors for the ALJ to weigh include: "(1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate her pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of her pain or other symptoms; (6) any measures the claimant uses or has used to relieve her pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms." *Id.* (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)).

The ALJ assessed Diakogiannis's subjective complaints in the context of a comprehensive review of the entire medical record. In doing so, the ALJ accounted for the relevant factors identified above and concluded that Diakogiannis did not have strong work history, did not seek ongoing treatment, did not take any medications to address his shoulder injury, other than an anti-inflammatory drug, and continued to perform many of his activities of daily living. Accordingly, I conclude that the ALJ applied the proper legal standards in analyzing Diakogiannis's subjective complaints and that substantial evidence supports the ALJ's determination that Diakogiannis's complaints "are not credible" to the extent they were inconsistent with the ALJ's RFC assessment. *See Luther v. Colvin*, 2013 WL 3816540 at *7 (ALJ properly assessed subjective complaints where she "reviewed all of [p]laintiff's subjective complaints . . . [and] properly considered [p]laintiff's activities of daily living, inconsistent testimony and how her symptoms affected her attempts at maintaining a job").

Although Diakogiannis contends that the ALJ misstated some of his testimony, I find that any misstatements were not material to the credibility analysis. The ALJ's decision

states that Diakogiannis testified that he could read the newspaper, yet Diakogiannis actually testified that he did not read the newspaper. However, the ALJ did not rely upon this statement in making her credibility determination. Diakogiannis also contends that the ALJ's decision improperly states that Diakogiannis testified that he was not taking any medications. The ALJ's decision properly notes that Diakogiannis was taking "500 mg of naproxen" and specifically notes in her credibility analysis that Diakogiannis was taking an anti-inflammatory drug for his shoulder. (Tr. 25, 28). Accordingly, I conclude that the ALJ's credibility assessment is supported by substantial evidence.

### 4. Vocational Expert Testimony

Diakogiannis contends that the ALJ erred in relying on the vocational expert because the hypothetical posed to the expert was based upon a flawed RFC assessment. Having determined that substantial evidence supports the ALJ's RFC determination, this argument is rejected. *See Wavercak v. Astrue*, 420 F. App'x 91, 95 (2d Cir. 2011) ("[b]ecause we have already concluded that substantial record evidence supports the RFC finding, we necessarily reject [plaintiff's] vocational expert challenge").

Finally, Diakogiannis argues that the ALJ erred in concluding that the vocational expert's testimony was consistent with the Dictionary of Occupational Titles ("DOT") because the vocational expert testified that his testimony concerning overhead reaching was not contained in the DOT. (Docket # 10-1 at 22). Having reviewed the testimony, I conclude that there was no conflict between the vocational expert's testimony and the DOT. *See Schmitt v. Astrue*, 2012 WL 4853067, *3 (N.D.N.Y. 2012) (concluding that expert's testimony did not conflict with the DOT; "the DOT does not categorize or describe jobs by the requirement of being able to sit or

stand at will[;] [t]herefore, there is no conflict on that ground between [the vocational expert's] testimony and the DOT").


## CONCLUSION

After careful review of the entire record, this Court finds that the Commissioner's denial of SSI was based on substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed. For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 11)** is **GRANTED**. Plaintiff's motion for judgment on the pleadings **(Docket # 10)** is **DENIED**, and plaintiff's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
          September   30  , 2013